**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE
CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA
In The Court of Appeals**

In the Matter of: Estate of Annie Mae Crosby.

Jessie Fred Crosby and Robert Edward Crosby, Jr.,
Respondents,

v.

Rose Mae Crosby Walsh, individually and as personal
representative of the Estate of Annie Mae Crosby, and
Kelvin Wayne Crosby, Respondents,

Of whom Rose Mae Crosby Walsh, individually and as
personal representative of the Estate of Annie Mae
Crosby, is the Appellant.

Appellate Case No. 2020-000853

———————————

Appeal From Charleston County
J. Derham Cole, Circuit Court Judge

———————————

Unpublished Opinion No. 2024-UP-158
Submitted May 1, 2023 – Filed May 8, 2024

———————————

**AFFIRMED**

———————————

Gregg E. Meyers, of Byron, MN, for Appellant.

Thomas E. Lydon, of McAngus Goudelock & Courie, LLC, of Columbia, for Respondents Jessie Fred Crosby and Robert Edward Crosby, Jr.

Kelvin W. Crosby, pro se.

---

**PER CURIAM:** Rose Walsh argues the circuit court erred in affirming the probate court's order removing her as personal representative of the Estate of Annie Mae Crosby (the Estate) despite her compliance with a prior court order. We affirm.

**Facts and Procedural History**

On April 15, 2009, Annie Mae Crosby (Mother) executed a will in which she appointed Walsh as her personal representative and an attorney (Attorney) as successor personal representative should Walsh cease to serve. Mother bequeathed 3329 Von Ohsen Road to Walsh and certain vacant land on Mill Street (the Mill Street Property) to her son, Jessie Crosby (Jessie). Mother's remaining real property, including 3283 Von Ohsen Road (the Family Home), was to be divided equally among her four children: Walsh, Jessie, Robert Crosby (Bobby), and Kelvin Crosby (Kelvin). Mother died on November 29, 2016.

On April 12, 2018, Walsh filed an amended petition to approve the sale of real estate; she requested authorization to sell the Family Home to herself and to sell other properties. Walsh provided appraisals for the Family Home, which appraised at $145,000 in 2016 and at $190,000 in 2018. Walsh sought to purchase the Family Home for $171,000 (90% of the appraised value minus closing costs).

On April 25, 2018, Jessie requested that Walsh deed him the Mill Street property within fifteen days. On May 15, Jessie requested an update on the Mill Street Property and asked that a deed of distribution be executed prior to any bidding for the Family Home. Walsh's counsel responded that she had advised Walsh she should not make a distribution only to Jessie at that time and preferred "that the remaining outstanding issues of the estate be resolved before further distributions are made from the estate." Walsh accepted this advice.

On May 16, 2018, the probate court ordered that the Family Home be sold to the highest bidder between Walsh and Jessie, with the bidding process to begin within thirty days (the Family Home Order). Pursuant to the Family Home Order, Walsh

would be the initial bidder with a bid not less than $190,000, and all bids thereafter required a minimum bid increase of $2,000.  The order further stated:

> (b) The bidding process shall commence within thirty (30) days of the date of this Order, and shall be initiated at the request of the Petitioner (the "Opening of the Bidding Period").  The first bid shall be submitted by Petitioner within twenty-four (24) hours of the Opening of the Bidding Period.  Jessie Fred Crosby shall have twenty-four (24) hours from the time the prior bid was sent to submit a higher bid.  The bidding shall continue back and forth until one of the parties refuses or fails to submit a higher bid within twenty-four (24) hours than the other party's previous bid.  For example, if Petitioner sends her initial bid at 2 p.m. EST on the first day, Jessie Fred Crosby has until 2 p.m. EST on the second day to submit a higher bid.

> . . . .

> (e) The person submitting the highest bid to purchase [the Family Home] must pay to the Personal Representative of the Decedent's Estate a sum equal to seventy-five percent (75%) of the highest bid within ten (10) days of making the final bid.  The highest bidder may only assign up to $75,000 of his or her expected share of the estate to the purchase.

> (f) If the highest bidder cannot make such payment within ten (10) days of making the final bid, then the other party may submit a bid equal to One Hundred Seventy-One Thousand Dollars ($171,000.00) and shall be the highest bidder.  Such bid shall be submitted in accordance with subparagraph (d), above, within two (2) days of the previous high bidder's failure to make payment in accordance with subparagraph (e).  The person submitting the bid pursuant to this subparagraph (f) must pay to the Personal Representative of the Decedent's Estate a sum equal to seventy-five percent (75%) of such highest bid within ten (10) days of making

the bid. Such highest bidder may only assign up to $75,000 of his or her expected share of the estate to the purchase.

The bidding process began on May 21. The following day, Jessie informed Walsh that although Jessie was the official bidder, Bobby and Jessie planned to co-own the Family Home and Bobby had authorized the use of $75,000 of his expected estate share towards the purchase.

On May 23, Jessie notified Walsh that he intended to file a motion to compel if she did not deed him the Mill Street Property. Walsh's counsel responded that Walsh would handle other distributions after the Family Home Order's distributions occurred because she would then "be in a better position to determine outstanding issues and begin making final distribution of the estate assets."

That same day, Jessie moved to compel Walsh to execute his Mill Street deed and moved to remove Walsh as personal representative. Jessie alleged Walsh breached her fiduciary duty by failing to deed him the Mill Street Property so that she would maintain a financial advantage during the bidding for the Family Home.

On May 30, the bidding process ended with Jessie's winning bid of $312,000. Walsh noted Jessie's payment was due by 2:07 p.m. on June 11. Jessie's counsel calculated Jessie and Bobby would each be required to pay $159,000 and emailed the Estate's counsel and Walsh's counsel to confirm the figures. Jessie's counsel arrived at $159,000 by taking 75% of the $312,000 Bid ($234,000) and subtracting $75,000 (Jessie's expected credit from the Estate).

Bobby and Jessie then remitted payment to Walsh. Bobby provided a note stating he was paying $78,000 to "pay off one of the heirs" because he and Jessie were purchasing the Family Home together, along with a $75,000 cashier's check and a $3,000 cashier's check. Jessie provided a note pledging his $75,000 credit from the Estate and a $3,000 cashier's check. In total, Bobby and Jessie provided $81,000 in cashier's checks.

Later that afternoon, Walsh notified Jessie's counsel that Jessie had not complied with the Family Home Order because Walsh was not authorized to accept Bobby's assignment of his expected share of the Estate. Walsh indicated that even if she could accept his assignment, she had only received $156,000, despite the order's requirement that Jessie pay $159,000. Walsh then recognized her own $171,000 bid as successful in acquiring the Family Home.

On June 20, Jessie and Bobby filed petitions to enforce the sale and remove Walsh as personal representative. They argued Walsh began the bidding process knowing Jessie would be at a financial disadvantage because she declined to deed him the Mill Street Property. They further asserted Walsh improperly denied Bobby's request to pledge his $75,000 credit toward Jessie's purchase of the Family Home.

On June 22, Walsh deeded the Family Home to herself. Three days later, she filed a return to the motions, along with counterclaims and a motion for judgment on the pleadings and/or summary judgment.

On July 11, the probate court heard the motions to compel and to remove Walsh as personal representative. Two days later, Walsh executed a deed of distribution to Jessie for the Mill Street Property. On July 26, Walsh filed an inventory and appraisement of certain assets, but she declined to provide account values. On July 28, the probate court ordered the parties to mediate. On July 31, Jessie and Bobby issued a subpoena requiring Walsh to produce statements for Mother's checking account. Walsh moved to quash and sought an order of protection.

At the December 2018 hearing before the probate court, Jessie testified he brought Bobby into the bidding process for the Family Home because he needed additional funds due to Walsh's refusal to deed him the Mill Street Property.

The probate court removed Walsh as personal representative and appointed Attorney as successor personal representative. The probate court found Walsh complied with the terms of the May 15, 2018 order but "failed to exercise reasonable care, skill, and caution" in refusing to allow Jessie and Bobby to purchase the Family Home for $312,000. The probate court further found Walsh violated her fiduciary duty and caused significant harm to the Estate when she sold the Family Home to herself for $141,000 less than Jessie and Bobby agreed to pay. The probate court instructed Walsh to deed the Family Home back to the Estate and ordered that Jessie and Bobby's agreement "to purchase the property for $312,000 shall be enforced." The Estate was ordered to accept Jessie and Bobby's $150,000 in notes and $81,000 in cashier's checks towards the purchase price. The probate court found Walsh's actions caused delays in distributing the Estate and conflict among the beneficiaries, including Kelvin, who was not involved in the dispute over the Family Home. Walsh appealed to the circuit court.

After hearing Walsh's appeal, the circuit court affirmed the probate court's decision. The circuit court found the probate court's requirement that the highest bidder pay 75% of the total bid was based on the fact that each beneficiary had a

25% interest in the Family Home, and the winning bidder would be purchasing the interests of the other beneficiaries. The circuit court's order provided the following calculations:

| | |
|---|---|
| Amount bid by Jessie and Bobby | $312,000.00 |
| Less: 50% interest owned by Jessie and Bobby | ($156,000.00) |
| BALANCE DUE TO ESTATE | $156,000.00 |
| Less: $75,000 credit per Consent Order | ($75,000.00) |
| NET BALANCE DUE TO ESTATE | $81,000.00 |

Walsh filed a timely Rule 59(e), SCRCP, motion, which the circuit court denied.

**Standard of Review**

"[A]n action for breach of fiduciary duty is either an action at law or in equity depending on the remedy sought." *Bennett v. Est. of King*, 436 S.C. 614, 621–22, 875 S.E.2d 46, 50 (2022). An action to remove a personal representative is equitable in nature. *Church v. McGee*, 391 S.C. 334, 342, 705 S.E.2d 481, 485 (Ct. App. 2011); *Blackmon v. Weaver*, 366 S.C. 245, 248, 621 S.E.2d 42, 43 (Ct. App. 2005). "In an action at equity, tried by a judge alone, [the court's] standard of review is de novo." *Fountain v. Fred's, Inc.*, 436 S.C. 40, 47, 871 S.E.2d 166, 170 (2022); *see also Gilbert v. McLeod Infirmary*, 219 S.C. 174, 184, 64 S.E.2d 524, 528 (1951) (noting an appellate court "ha[s] jurisdiction in appeals in equity to find the facts in accord with our view of the preponderance or greater weight of the evidence").

**Analysis**

**I. Consent Order**

Initially, Walsh argues the circuit court erred in finding the Family Home Order was not a consent order. Walsh contends that because the Family Home Order is a consent order, Respondents cannot complain because she complied with the requirements of the order. We disagree.

First, we find Walsh failed to preserve this issue for appellate review. Although Walsh repeatedly called the May 16, 2018 order a consent order before both the probate and circuit courts, she did not argue Jessie and Bobby could not be "aggrieved" as she now seeks to assert on appeal. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review.").

In any event, whether the order was a consent order or not is immaterial. Jessie and Bobby did not challenge the order itself—they sought to enforce the real property sale and have Walsh removed for her breaches of fiduciary duty. The probate court did not remove Walsh for her noncompliance with the Family Home Order but for her breaches of fiduciary duty to the Estate and its beneficiaries.

## II. Removal of Personal Representative

Walsh next argues the circuit court erred in affirming the probate court's order removing her as personal representative of the Estate. Walsh contends she did not breach her fiduciary duties because she complied with the probate court's order governing the sale of the Family Home. Again, Walsh misunderstands the probate court's decree. Section 62-3-703(a) of the South Carolina Code provides:

> A personal representative is a fiduciary who shall observe the standards of care described by Section 62-7-804. A personal representative has a duty to settle and distribute the estate of the decedent in accordance with the terms of a probated and effective will and this code, and as expeditiously and efficiently as is consistent with the best interests of the estate. He shall use the authority conferred upon him by this code, the terms of the will, and any order in proceedings to which he is party for the best interests of successors to the estate.

S.C. Code Ann. § 62-3-703(a) (Supp. 2023). Section 62-7-804 states, "A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution."

"A person interested in the estate may petition for removal of a personal representative for cause at any time." S.C. Code Ann. § 62-3-611(a) (Supp. 2023).

> Cause for removal exists when removal would be in the best interests of the estate, or if it is shown that a personal representative or the person seeking his appointment intentionally misrepresented material facts in the proceedings leading to his appointment, or that the personal representative has disregarded an order of the court, has become incapable of discharging the duties of his office, or has mismanaged the estate or failed to perform any duty pertaining to the office.

S.C. Code Ann. § 62-3-611(b) (Supp. 2023).

Here, the evidence established that Walsh breached her fiduciary duty to the Estate. Walsh had a duty to administer the Estate in the best interest of the beneficiaries. Even if Walsh complied with the Family Home Order, she also clearly attempted actions not in the Estate's best interest.

After submitting the highest bid, Jessie and Bobby remitted payment within ten days as required at 11:30 a.m. on June 11, 2018. At 2:49 p.m. on June 11, 2018—not even an hour after the payment deadline—Walsh informed Jessie's counsel that he had not complied with the probate court's order and accepted her own much lower bid. Walsh did not notify Jessie and Bobby that she believed their payment to be $3,000 short nor give them time to correct the alleged mistake prior to her effort to purchase the Family Home at a significantly lower price. Walsh was fully aware that accepting her much lower bid would result in Kelvin receiving some $30,000 less as an Estate beneficiary. To act in the best interests of the Estate, Walsh should have notified Jessie prior to the 2:07 p.m. deadline that his payment was insufficient. We find Walsh's decision to instead notify her own counsel of her intent to exercise the purchase option within twenty minutes—and maybe sooner—of the payment deadline is further evidence of her failure to act in the Estate's best interests. When their payment was remitted, Jessie and Bobby gave no indication that they intended to pay only $156,000; in fact, their counsel calculated the amount owed to the Estate as $159,000, confirmed such with Walsh's counsel, and engaged in several emails discussing the payment process. Additionally, when it became apparent that there was a dispute over whether Jessie and Bobby owed $156,0000 or $159,000, Walsh could have sought clarification from the probate court but chose not to—presumably in support of her own effort

to purchase the Family Home at the considerably lower price. Notably, Jessie and Bobby's calculation of $156,000 is based on each beneficiary having a 25% interest in the Family Home; thus, they were purchasing Kelvin and Walsh's 25% interests, valued at $78,000 each.[1] Initially, the parties calculated the amount owed to the Estate differently. Even though the order allowed Walsh to exercise her option to purchase at $171,000, the exercise of reasonable care, skill, and caution in pursuing the Estate's best interest required—at a minimum—notifying Jessie and Bobby of a potential miscalculation. When the probate court included the option for the losing bidder to purchase the Family Home for $171,000 if the winning bidder did not pay within ten days, it likely contemplated a situation in which the winning bidder failed to pay at all or could not afford the purchase—not a dispute over how to calculate the amount owed.

We find Walsh's refusal to deed the Mill Street Property to Jessie problematic as well. Jessie testified he wanted to use the Mill Street Property as collateral in the bidding process. Yet, despite Mother's specific bequest, Walsh claimed she did not think she could distribute the Mill Street Property without distributing the other properties. Regardless of the reason Jessie sought the deed to which he was entitled, we see no reason Walsh could not have complied. Walsh testified the Estate was incurring expenses; however, she admitted approximately $370,000 in cash remained. Thus, her refusal to deed the Mill Street Property to Jessie further supported her removal as personal representative.

For these reasons, the circuit court's order affirming the probate court's removal of Walsh as personal representative of the Estate is

**AFFIRMED.**[2]

**THOMAS, MCDONALD, and HEWITT, JJ., concur.**

---

[1] This is likely the proper calculation. The Family Home Order contemplated a sole beneficiary purchasing the Family Home, which is likely how it arrived at 75% of the purchase price to be paid to the Estate. Walsh's duty of care required her to at least consider whether this calculation method was proper and to consult the probate court if necessary, as opposed to simply voiding Jessie and Bobby's purchase effort in favor of exercising her own lower bid—despite its negative impact on the value of the Estate.

[2] We decide this case without oral argument pursuant to Rule 215, SCACR.